## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

GISELLE P. GAINER     )
4957 E. 81st St.      )
Garfield Hts., OH 44125   ) **CASE NO.:**
           )
 Plaintiff,      )
           ) **JUDGE:**
vs.         )
           )
ROCKWELL AUTOMATION, INC. ) **COMPLAINT WITH JURY DEMAND**
World Headquarters    )
1201 S. 2nd St.      )
Milwaukee, WI 53204   )
           )
and         )
           )
KIM LAWRENCE     )
N58W23780 Hastings Court  )
Sussex, WI 53089     )
           )
 Defendants.     )
           )
           )
           )

## NATURE OF THE ACTION- PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991, for injunctive and declaratory relief and money damages for Defendants' violations of the civil rights of Plaintiff, Giselle P. Gainer ("Gainer").

2. Gainer has been denied terms, conditions and privileges of employment because of her race (African-American) and in retaliation for her having engaged in protected activity.

## JURISDICTION AND VENUE

3. This action is instituted and authorized under Section 706(f)(1) of Title VII of the Ohio Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2, et seq. and §102 of the Civil Rights Act of 1991, 42 U.S.C. §1981 (a).

4. Jurisdiction of this Court to hear and determine these claims is based on 28 U.S.C. §1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

5. Supplemental and/or "pendant" jurisdiction is invoked pursuant to 28 U.S.C. §1367.

6. A declaratory judgment is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Venue is proper in this Court as all the acts complained of herein have occurred in Ohio, within the jurisdiction of this Court.

## PARTIES

**Plaintiff:**

8. Gainer is an African-American female residing in Garfield Heights, Ohio, in the county of Cuyahoga who was over the age of majority at all relevant times.

9. Gainer was employed by Rockwell Automation, Inc. ("Rockwell") as a Senior HR Business Partner from October 7, 2013 through September 7, 2016.

**Defendants:**

10. Rockwell is a global provider of industrial automation and information technology, including brands such as Allen-Bradley and Rockwell Software.  Headquartered in Milwaukee, Wisconsin, Rockwell employs over 22,000 people and has customers in more than 80 countries worldwide.  Rockwell grosses over $6.3 billion in annual revenue.

Gainer worked at the Rockwell facility located at 8440 Darrow Rd., Twinsburg, Ohio 44087.

11. Rockwell maintains global policies that claim that they prohibit employees from discriminating against other employees based on race and retaliation, among other things. (See Plaintiff's EXHIBIT 1, Rockwell Automation Global Policy; EXHIBIT 2, Rockwell Automation Code of Conduct, attached)

12. Kim Lawrence ("Lawrence") (Caucasian) was the Human Resources Director of Operations and Engineering Services at Rockwell from June 22, 2015 through the time of Gainer's termination on September 7, 2016.

## STATEMENT OF FACTS

**Background and Organizational Layout**

13. Gainer is an African-American female residing in Garfield Heights, Ohio. She was hired by Rockwell on October 7, 2013 in the capacity of Senior Human Resources Representative, ("Sr. Hr. Rep.") for the Operations and Engineering Services ("OES") business unit. In this role she was responsible for leading all aspects of Human Resources for the Twinsburg manufacturing facility.

14. Gainer held that position until her employment was unlawfully terminated on September 7, 2016. At the time of her termination Gainer supported approximately 275 employees. Those supported include a Plant Manager, a six-person management team, 9 production supervisors and a multitude of production level employees across a 24/7 operation.

15. All Rockwell Manufacturing facilities operate with a Sr. HR Rep., who in this case was Gainer. The Sr.HR Rep reports to the OES HR Director in Milwaukee. This was not the

3

case for the Twinsburg manufacturing facility from approximately July 15, 2015 through Gainer's termination on September 7, 2016.

16. During that time Gainer was the only Human Resources presence at the facility. A Human Resources Representative position was posted; however, no candidate was selected. Eventually, colleague support was provided, intermittently, approximately two months before Gainer's termination.

17. Christine Cuske Haibucher ("Cuske") hired Gainer into the organization. Cuske was Gainer's direct manager until June 22, 2015, the date Lawrence was hired as a Human Resources Director for the OES business unit. (See Plaintiff's EXHIBIT 3, June 16, 2015 New Hire Announcement for Lawrence).

18. Both Directors were located in Milwaukee, Wisconsin at Rockwell Automation's Corporate Office. Gainer reported to Lawrence from the time Lawrence was hired until shortly before Gainer's termination, when a layer of supervision was added between their reporting relationship. Approximately 1-2 months after Lawrence's promotion on March 24, 2016, Gainer began reporting to Lindsay Glick, Human Resources Manager ("Glick") (Caucasian).

19. In January of 2016, Christopher Daniels ("Daniels") (Caucasian) was hired as the Vice President of Human Resources for the OES business unit. Cuske also helped train/on-board Daniels, and made him aware, early on, of Gainer's concerns with Lawrence. Cuske, having previously managed Gainer, trained and, at one point, was the acting supervisor for Lawrence. In Cuske's unique capacity, Cuske had the opportunity to witness the interactions between Lawrence and Gainer.

4

20. During Gainer's tenure, she had four core peers in the Operations and Engineering Services ("OES"), all of whom reported to Lawrence. Their names, titles, demographic information and working locations are:

    a. Cesar Rivera ("Hispanic"), Human Resources Manager, Location: Monterrey, Mexico (Manufacturing Plant);

    b. Carmen Cavallo ("Caucasian"), Human Resources Project Specialist, Location Milwaukee, WI (Corporate Headquarters);

    c. Karen Lusher ("Caucasian"), Human Resources Manager, Location, Mequon, WI (Manufacturing Plant); and

    d. Julie Dean ("Caucasian"), Contractor—Human Resources Location: Near Twinsburg, OH, (Worked Remotely).

**Human Resources Representative Position**

21. On July 21, 2015 a Human Resources Representative replacement was approved for the Twinsburg facility. David Bolgar (Caucasian) previously held this role until he left Rockwell for another opportunity. For 4th quarter budgetary reasons, this position was removed in August and reposted on October 6, 2015, leaving Gainer as the only HR person in the facility to support the 275 employees.

22. The Twinsburg Management Team and Gainer interviewed approximately 7 candidates in December of 2015. After selecting the candidates, the Twinsburg Team and Gainer presented the top three candidates to Lawrence for an additional phone screening. Tawana Battle (African American) ("Battle") was the top candidate. Lawrence interviewed her approximately two weeks after the interviews with the Twinsburg Team and Gainer. When Gainer followed up with Lawrence, Lawrence thought Battle was a good candidate and

5

suggested they go ahead and initiate the drug screen prior to Battle receiving the offer. Gainer asked Lawrence what salary offer would be made to Battle, and Lawrence stated she didn't think they were ready to make an offer just yet. Gainer was confused by Lawrence's statement since a drug test is not required or even allowed until after an employment offer is made. Lawrence then said she would contact the Compensation Team to discuss an appropriate salary for Battle. Battle went to another company due to the extensive and lengthy internal salary negotiations at Rockwell.  When Gainer told Lawrence about Battle accepting another offer, Lawrence texted Gainer asking if Gainer was "bummed about it." This was an attempt by Lawrence to aggravate Gainer because the position had been vacant for approximately six months.

23. In March of 2016 the Twinsburg Team and Gainer interviewed a candidate by the name of Kim Wazevalek (Caucasian) for the same position.  Lawrence interviewed Wazevalek and thought the interview "went ok" but felt she was too early in her career. However, Gainer and Lawrence agreed to discuss the candidate in greater detail, as Gainer was in dire need of support and was open to working with someone with limited experience. There was at no time any mention, whatsoever, of initiating any drug or background screenings for Wazevalek during the pre-offer phase as there had been for qualified African-American candidates.

24. In April of 2016, the Twinsburg Team and Gainer interviewed another candidate, Stephanie Brown (African-American). The Twinsburg team and Gainer believed Brown was a very solid candidate. Gainer submitted Brown to Lawrence for an interview. Gainer followed up with Lawrence on April 25, 2016 to see how the interview with Brown went. Lawrence thought Brown was a good candidate but had some minor concerns. Gainer and

Lawrence discussed the minor concerns briefly. Lawrence was then ok with moving forward in the process.

25. Lawrence stated they could proceed with starting the background check. Gainer then asked what salary offer they wanted to make to Brown. Lawrence stated she didn't think they were at that point yet and that she wanted Brown to meet with Daniels first. Gainer then reminded Lawrence that the offer had to be made before any background or drug screen was initiated. Lawrence proceeded to say that that wasn't true and that Lawrence's background check was started with Rockwell before she was made an offer. Gainer forwarded Lawrence a standard email from Rockwell's Talent Acquisition Team that is forwarded to all new hires. Included in the email was the offer letter, with verbiage on the background check and drug screening contingency, along with other standard new hire paperwork. Gainer followed up with Lawrence on May 5, 2016 and May 9, 2016 to see if Lawrence received any feedback from Daniels on his interview with Brown. Gainer did not receive a response.

26. Although there were candidates that Gainer, as well as the Twinsburg Leadership Team liked, this position was never filled. To Gainer's knowledge, it was still open when she was terminated on September 7, 2016. Having this vacancy for this expansive amount of time made Gainer's job that much more difficult.

**Differential Treatment**

27. Prior to their first face-to-face meeting at the Milwaukee Headquarters, Lawrence and Gainer had a pleasant working relationship. Lawrence's interactions were professional, and

Lawrence acknowledged the quality of Gainer's work in a fair manner. Unfortunately, subsequent to their first having met, the relationship between Lawrence and Gainer deteriorated.

28. In July or August of 2015, Lawrence led their first team meeting via phone conference. Gainer and all of her peers listed above, with the exception of Dean, were present on the call. During this meeting, Lawrence was leading a discussion on the project to revise OES's production employee review form. The team was aware of this project prior to Lawrence joining Rockwell, as Carmen Cavallo and Julie Dean had been collaborating to spearhead this effort.

29. In fact, since Julie resided close to the Twinsburg facility, Gainer suggested she use the Twinsburg Production Supervisors as a focus group to give feedback on the form and process since they were the front-line individuals that would be using the form and following the process. Julie agreed and visited the plant in early 2015 to solicit the supervisors for feedback.

30. As Lawrence was updating Gainer and her peers on the status of the project, she asked that those on the call view a copy of the most recent version of the document live, via Skype and give our feedback. Everyone took turns giving their input. As Gainer began to speak, Lawrence asked her, "Is there a problem?" Gainer responded that there wasn't and that she was just looking at the changes to the form and getting ready to share her feedback.

31. The form had been changed drastically from what was last shared amongst the team. Also, there was very little feedback implemented from the Production Supervisor focus group at the Twinsburg facility. Her interaction with Gainer in this scenario was extremely

unprofessional and set an openly uncomfortable tone with Gainer's peers regarding the relationship between Lawrence and Gainer.

32. Although Gainer's and Lawrence's interactions deteriorated subsequent to July of 2015, the antagonizing treatment by Lawrence against Gainer greatly intensified during and after Lawrence's visit to the Twinsburg Manufacturing facility on October 28-30, 2015.

33. Toward the end of her visit, Lawrence gave Gainer feedback on the employees, supervisors, and managers view of Gainer's level of service. During their conversation, Lawrence gave Gainer an overwhelming amount of negative feedback, so much to the point that Gainer asked, specifically, if "anyone had anything good to say?" Lawrence stated, "Actually, no."

34. That bothered Gainer because she had not heard such feedback, nor were Gainer's day to day interactions supportive of Lawrence's responses, not to mention the countless times employees, at all levels, pre- and post- Lawrence's visit, expressed their level of appreciation for the assistance Gainer provided.

35. A couple of weeks after Lawrence's visit, Lawrence provided German Mendez, Twinsburg Plant Manager, ("Mendez") (Hispanic) with summary notes from her visit. Gainer was not provided a copy by Lawrence. Mendez shared the notes with Gainer.

36. When Gainer reviewed the notes, she noticed there was very little information about dissatisfaction on Gainer's level of Human Resources service. Seeing that made Gainer call into question Lawrence's earlier statement about no one having anything positive to say about Gainer's level of service. For that reason, shortly thereafter, Gainer volunteered to solicit anonymous feedback about her service level, in multiple ways, from employees she supported across all levels.

37. Gainer also solicited feedback from her peers and a few HR colleagues. In December of 2015, Gainer requested a 360-Emotional Intelligence Assessment be conducted. Gainer also developed an open ended, single question, anonymous confidential survey via Survey Monkey about Gainer's service level. Both of these feedback requests were sent to over 20 individuals.

38. Included were all of the individuals Lawrence met with during her visit and more. Requests for feedback were sent to all managers Gainer supported, all supervisors, all manufacturing team leads, Lawrence, Gainer's HR peers, and some of Gainer's other HR colleagues.

39. Results from the emotional intelligence assessment clearly show that Lawrence's view of Gainer was inaccurate and biased. Lawrence's ratings of Gainer were far lower in multiple categories compared to those Gainer had worked with daily.

40. The same was true for those Gainer worked with prior to Lawrence joining Rockwell. The Survey Monkey feedback delivered no overwhelmingly negative responses as Lawrence had incorrectly predicted. In fact, there were some very positive responses countering Lawrence's feedback during her visit.

41. As a third form of feedback, Gainer requested that Stacey Bizzell ("Bizzell") (African-American), a Human Resources colleague from Rockwell's Mayfield Heights facility conduct a "Start, Stop, Continue" session on the level of HR service being delivered by Gainer.

42. This in-person session allowed a group of production level employees to give candid, confidential feedback on what Gainer, as their HR leader, should stop doing, start doing, and continue doing to support them effectively. The Start Stop Continue feedback was very

positive. The participants focused highly on Gainer using her influence to help improve the direction of management.

43. Seeing these results not only negated Lawrence's earlier statement about employee dissatisfaction with Gainer's service across all levels of the facility; it made Gainer question Lawrence's integrity.

44. Gainer was especially concerned since Lawrence delivered Gainer's annual review shortly after Lawrence's Twinsburg visit in October, where Lawrence provided this false feedback to Gainer, yet Gainer had not received any feedback from the three voluntary solicitations described – all of which countered Lawrence's off-base incorrect conclusions.

45. For Gainer's 2015 year-end review, Lawrence allotted Gainer the minimum increase percentage allowable for the review period. After seeing the feedback from the voluntary solicitations, Gainer not only was upset and confused, she was convinced that Lawrence's biases impacted the outcome of Gainer's annual review.

46. In December of 2015, Lawrence told Gainer about a Human Resources Representative position that was going to be available at the Mayfield Heights facility. Gainer was directed to speak with Charlene Franz, Human Resources Global Leader - Services Business ("Franz") (Caucasian) about the position. Although it was a level below Gainer's current role, Gainer decided to reach out to Franz, as recommended, to discuss the role further. Franz agreed to connect with Gainer on December 2, 2015. However, Franz called and rescheduled their meeting multiple times that week.

47. At the next 1-on-1 between Lawrence and Gainer on approximately December 8, 2015, Gainer told Lawrence about her attempts to reach out to Franz and the multiple cancellations.

48. Lawrence then told Gainer that Lawrence ran into Franz at lunch one day and told Franz that Lawrence felt that the job was "too big" for Gainer.

49. At this time, Gainer had been working with Lawrence for less than six months. When Gainer mentioned the job being a level below her then current role, Lawrence said to Gainer that that did not change her opinion. This helped Gainer understand why Franz kept cancelling.

50. After the discussion with Lawrence, Gainer reached out to Franz to let her know that Gainer was no longer interested in discussing the opportunity. Gainer felt completely sabotaged by Lawrence and Franz (both Caucasian).

51. On January 28, 2016, Lawrence led an open dialogue between her, Gainer's peers, and Gainer. Cuske was also present.

52. At the meeting, Lawrence was required to listen to feedback and apologize for her style as a result of feedback from a leadership assessment in which she was required to participate.

53. It was very apparent that Gainer was treated disparately from that of her peers.

54. As a follow up to the team discussion, Lawrence was supposed to schedule meetings with each team member individually to discuss concerns further. On January 21, 2016, one week prior to the team meeting, Lawrence sent Gainer an email with an agenda for her upcoming, second visit to Twinsburg. Unlike Gainer's peers, Lawrence's agenda did not include discussing any concerns Gainer had with Lawrence.

55. Gainer requested Lawrence conduct a meeting with Gainer and Mendez in November of 2015, however Lawrence put it off. Prior to Lawrence joining the organization, Mendez and Gainer had a great working relationship.

56. Shortly after Lawrence started with Rockwell, the partnership between Mendez and Gainer began to drift to the point Mendez was only meeting with Lawrence and not Gainer.

57. Whenever Gainer would ask Mendez or Lawrence what the issue was, Mendez and Lawrence would give Gainer different and inconsistent answers. To get on the same page, Gainer requested they all meet so Gainer could better understand what Mendez's concerns were, if any, and fix them, if necessary.

58. On February 25, 2016, Lawrence scheduled a meeting for her, Mendez, and Gainer to discuss relationship concerns Mendez allegedly had with Gainer.

59. During the call, Lawrence was constantly cutting Gainer off, saying Gainer wasn't listening to Mendez's feedback, and only allowing Mendez to speak.

60. The call became very overwhelming for Gainer and Gainer felt sabotaged and attacked. Gainer asked if they could end the call. Gainer felt this was appropriate since she requested the meeting but was unable to participate.

61. Lawrence completely disregarded what Gainer requested, which was that she be heard, and when that didn't happen, Gainer requested that the call be ended. Lawrence ignored Gainer's request and asked Mendez if Mendez wanted to end the call. Mendez saw how overwhelmed Gainer had gotten and said he wanted to end the call as well and work on the relationship directly with Gainer. Lawrence repeatedly asked Mendez if he was sure, still not acknowledging Gainer. Mendez recognizing Gainer's uncomfortableness with the call apologized for his participation.

62. Mid-year and annual performance reviews are required for all employees at Rockwell. There have been employees reinstated to their jobs due to not having one or both of the required performance reviews, as they are critical feedback opportunities. On March 30, 2016, Lawrence scheduled a meeting for her and Gainer to complete Gainer's mid-year review.

63. As normal protocol, Lawrence also sent an email to Gainer's peers and Gainer requesting the names of their customers from whom they wanted Lawrence to solicit performance review feedback. Gainer provided Lawrence a list of names the following day from whom Lawrence could obtain the feedback.

64. Although the review was scheduled well in advance and feedback from Gainer's customers was received by Lawrence, Gainer's mid-year review was cancelled on May 3, 2016 and was never rescheduled prohibiting the opportunity for Gainer to receive feedback on her performance.

65. On April 1, 2016, after receiving continuous antagonistic and discriminatory treatment from Lawrence, Gainer reached out to Daniels and Cuske to request they again discussed Gainer's ongoing experience with Lawrence in greater detail.

66. Gainer couldn't take the harassment any more. Lawrence was continuously belittling Gainer on calls, requiring Gainer to redo work multiple times, sabotaging Gainer's work relationships and having Gainer operate under unfair and malicious circumstances.

67. On April 4, 2016, Gainer's requested meeting about Lawrence's ongoing antagonistic and discriminatory behavior occurred. Daniels was the only one able to attend the meeting since

14

Cuske had moved into a new role within the organization. During the meeting Gainer discussed with Daniels the discriminatory treatment she was still receiving from Lawrence.

68. Shortly into the conversation, Daniels began asking Gainer if Lawrence's treatment of Gainer could be about Gainer's performance. This caught Gainer off guard since she had not had a discussion about her performance at any time during Gainer's tenure at Rockwell. Gainer told Daniels she didn't believe performance was an issue since that was the first time Gainer was hearing about performance from anyone.

69. Daniels tried to persuade Gainer into believing there were others, "even in Milwaukee," that felt Gainer's performance was sub-par.

70. Gainer continued to tell Daniels she hadn't heard that or seen any documentation to support that. As they ended the conversation, Daniels stated he would look into the concerns, but Gainer's performance would also begin to be monitored. Gainer told Daniels she was okay with that.

71. Daniels was aware of the issues Gainer had with Lawrence very early during his tenure with Rockwell, as Cuske explained them to Daniels as part of Daniels' new hire on-boarding. Daniels was also privy to Gainer's ongoing complaints about Lawrence's differential treatment as it relates to Gainer's non-African American peers. This was discussed during weekly one-on-ones Gainer scheduled with Daniels at Daniel's request.

72. When Daniels visited Twinsburg shortly after he started with Rockwell, Daniels and Gainer had a discussion about Lawrence's treatment of Gainer. Daniels also scheduled weekly meetings with Gainer where Gainer's concerns about Lawrence and their relationship was

a recurring agenda item. No actions were taken at any time by Daniels to end Lawrence's discriminatory behavior.

73. On April 28, 2016, Gainer escalated her concerns to Rockwell Automation's legal department and informed them about the ongoing discriminatory treatment she was receiving.

74. The same day, April 28, 2016 Gainer also sent Cuske an email example of Lawrence being overly critical of Gainer's work. Gainer would have sent it to Daniels, however, based on the prior discussions between Gainer and Daniels, Gainer did not now trust Daniels to take the concern seriously.

75. After escalating Gainer's concerns to Rockwell's legal department about the discriminatory treatment Gainer was receiving due to her race, Gainer was offered a severance agreement dated May 3, 2016 in lieu of the company investigating her concerns of racial discrimination.

76. Before Gainer had time to review the agreement and make a decision on acceptance or refusal, Lawrence falsely informed Mendez that Gainer was resigning that day, creating unnecessary confusion and friction between Gainer and Mendez.

77. On May 5, 2016, Gainer sent an email to Lawrence and Daniels advising them of Gainer's decision to not pursue the offered mutual separation but continued employment with Rockwell.

78. Even with this additional confirmation of Gainer's continued employment, Gainer's mid-year review, that was cancelled by Lawrence on May 3, 2016, was not rescheduled. Gainer

found this odd, even though the discussion had been scheduled over one month in advance and feedback from Gainer's customers had already been provided, giving Lawrence ample time to prepare for the discussion.

79. On May 13, 2016, Gainer sent Lawrence an email requesting that Gainer work remotely that Friday, given Gainer's unusual schedule that week. Lawrence allowed Gainer to work from home as a "one-time event" stating that Gainer's role called for a person to be on-site to ensure the proper level of support.

80. However, when the Human Resources Representative position for Twinsburg was originally opened in July of 2015, Lindsay Galovits, Recruiting Co-ordinator stationed in Milwaukee (Caucasian) expressed interest in the role and Lawrence wanted to consider Galovits for the position, even though Galovits would remain in Milwaukee while providing daily support to the Twinsburg facility. No relocation package was offered for this position, therefore Galovitz would have been permitted to work remotely every day.

81. As the sole HR presence at the Twinsburg facility, Gainer worked very late hours on a regular basis to manage projects and sustain a good level of support for Gainer's customers across a 24/7 facility.

82. Working remotely was a normal practice at Rockwell. Gainer's peers took advantage of working from home as needed. In fact, there are multiple senior-level and general Human

Resources Representatives that are stationed in Milwaukee but support various aspects of certain manufacturing plants in different parts of the nation and world.

83. On approximately May 16, 2016, Kathleen Donius (Caucasian), Associate General Counsel for Rockwell ("Donius"), called Gainer to inform her that Jill Pedigo Hall ("Hall") (Caucasian), outside counsel, would be visiting Twinsburg to discuss Gainer's concerns about racial discrimination. At the time, Donius was unable to provide Gainer with a date or time of Hall's visit.

84. On May 24, 2016, Gainer received an email from Hall stating that Hall was in Twinsburg that day and needed to meet with Gainer on the investigation that day, which prohibited Gainer from the opportunity to gather pertinent information for the meeting. Gainer was unable to meet that day due to meetings plus Gainer was previously unaware that Hall had flown in that day.

85. Hall suggested that Gainer meet with her the following day at 10:00 a.m. Gainer asked if they could postpone the meeting so she could arrange her documentation, however, Hall insisted they meet at that time.

86. To comply with the investigation, Gainer agreed.

87. During the meeting, Gainer was not allowed to take notes during the 4-hour discussion even though Hall took extensive notes. Gainer was also required to shut off her cell phone and any other electronic devices.

88. Hall also met with key members of the management team in Twinsburg and spoke with Gainer's peers. Based on information directly from those interviews, Hall's questions to the management team were focused on Gainer's performance more so than Gainer's concern about racial discrimination.

18

89. At the conclusion of Hall's investigation, Gainer requested copies of the questions and answers from the investigation.

90. Gainer's request was denied by Hall.

91. On July 7, 2016, Gainer initiated FMLA leave.

92. On July 25, 2016, Gainer's job was posted on Rockwell's internal career site for replacement. When Gainer returned to work on August 30, 2016, employees were shocked.

93. According to employees, Lawrence flew in and conducted a meeting with employees while Gainer was out on leave.

94. Gainer was told that during the meeting, Lawrence explained that there would be changes to Twinsburg's Human Resources Department. Based on the meeting, employees thought Gainer wasn't coming back.

95. When Gainer asked Glick, her manager at the time, about the job posting, Glick told Gainer there was nothing to worry about and that there would be two Senior HR Representatives in Twinsburg due to the amount of improvement that needed to be made. Gainer found that very odd as no other manufacturing facilities had two Senior HR Representatives. Typically, the manufacturing facilities have one Senior HR Representative and one general HR Representative.

96. Gainer later found out that candidates had been interviewed for Gainer's role while Gainer was out on medical leave.

97. On September 7, 2016, exactly one month before Gainer's 3-year anniversary and the date of Gainer's 401K vesting, Gainer's employment with Rockwell was terminated, which, among other things, resulted in Gainer's forfeiture of $9,517.20 at the time of termination.

98. Glick, Joy Aleksich ("Aleksich") (Caucasian), Gainer's HR manager, and Karen Cronin ("Cronin") (Caucasian) HR Director in Mayfield Heights, all Caucasian, were all present for Gainer's termination. Aleksich was present via phone. Cronin was there solely as a witness to the termination.

99.  Glick initiated Gainer's termination conversation by stating "as you know, per your former manager (Lawrence) there have been some performance issues. So, for that we are terminating your employment effective today."

100.     Gainer immediately asked Aleksich if there was any documentation on performance Gainer was missing because Gainer had never been written up and had not received any negative performance reviews.

101.     Aleksich told Gainer she had to "look and see what notes Daniels has."

102.     There was no negative performance documentation, nor was Aleksich readily aware of any.

103.     Gainer was further confused because during this termination discussion, Gainer was offered yet another severance agreement at the time of termination, which required waiving all possible claims against Rockwell, Lawrence and any other related parties.

104.     Gainer then asked Aleksich if she could have a copy of her entire employment file. Aleksich assured Gainer that she could. Gainer then asked if Aleksich could scan and email the file to her as well as mail a copy and Aleksich agreed.

105.     On October 3, 2016 Gainer received a copy of her employment file from Aleksich via email. There were no negative reviews nor were there any writeups in Gainer's file. As a note, in February and March of 2016, Lawrence and Gainer had been discussing Gainer's

career development. That would not have been the case if Gainer's performance had been poor. Additionally, there was no mid-review on file for 2016.

106.    At all times relevant there existed a Corrective Action Policy dictating the disciplinary procedure at Rockwell. Said policy was not followed as it relates to the disciplinary action taken against Gainer.

107.    Gainer has exhausted the procedural prerequisites for bringing and maintaining this action, to wit: Gainer filed timely a race and retaliation charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge 532-2016-02152, (See Plaintiff's EXHIBIT 4, Equal Employment Opportunity Commission ("EEOC"), Charge 532-2016-02152, attached)

108.    On December 13, 2018 the EEOC closed its file on this case, issuing a 90 day right to sue letter, a prerequisite to Gainer filing this lawsuit. Gainer has filed this lawsuit, per the attached right to sue letter, timely. (See Plaintiff's EXHIBIT 5, EEOC Right to Sue Letter, attached)

## **STATEMENT OF FEDERAL CLAIMS**

## **COUNT 1-TITLE VII: RACE DISCRIMINATION**

1. Gainer hereby reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

2. Gainer was, at all times relevant a member of the protected class, African-American.

3. Gainer suffered an adverse employment action when she was terminated on September 7, 2016.

4. Gainer was qualified for the position. Gainer had achieved a bachelor's degree in criminal justice and at the time of her termination she was in the process of completing a Master's Certification in Human Resources Management from Cornell University which she has since completed. Gainer also had 8 successful years previous HR experiences with Forest City Enterprises.

5. Prior to her termination Gainer's qualifications and performance had not been called into question.

6. From Gainer's hire date of October 7, 2013 through June of 2015, Gainer reported to Cuske. During this time, Gainer had no issues brought to her attention regarding her performance or any other aspect of her job.

7. Gainer was treated differently than similarly situated, non-protected employees. At all times relevant, Gainer was the only African American working in OES HR and under the supervision of, *inter alia*, Lawrence.

8. Gainer started being given extremely strict and harsh project specifications, far more so than her non-African American counterparts. Lawrence was continuously hyper-critical of Gainer's work and would concoct reasons to make Gainer redo projects and the like multiple times.

9. It is important to note that Gainer had worked for Rockwell as a Sr. Human Resources Representative from 10/7/13 to 9/7/16 for almost 3 years. Gainer has never received any disciplinary performance write ups or poor performance reviews.

10. Gainer was not given a 2016 mid-year review to discuss performance, as required by Rockwell for all employees.

11. For the foregoing reasons Gainer has been discriminated against based on her race in violation of Title VII of the Civil Rights Act of 1964 as amended in 1972.

## COUNT 2-<u>TITLE VII: RETALIATION DISCRIMINATION</u>

12. Gainer hereby asserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

13. Gainer engaged in a protected activity. On April 4, 2016, Gainer reported Lawrence's behavior to Chris Daniels, VP of HR. Nothing came of this report to Daniels, and Lawrence's discriminatory treatment of Gainer continued.

14. On April 28, 2016 Gainer filed an internal complaint of race discrimination against Lawrence. This complaint was submitted, via Rockwell's policy, verbally, to Kathleen Donius, Rockwell's Associate General Counsel.

15. The exercise of Gainer's protected activity was or should have been known by defendants.

16. Following Gainer's protected activity, the defendants took action which was materially adverse to Gainer. On May 3, 2016, Defendants offered Gainer a separation agreement in lieu of investigating her claims of discrimination. This constitutes retaliatory conduct because the transparent offer of separation in lieu of investigation was evidence of the defendants' discriminatory animus resulting from Gainer's complaint of discrimination. Gainer, after consideration, rejected the separation agreement.

17. On September 7, 2016, Defendants terminated Gainer's employment, citing poor work performance. This was the first mention whatsoever of poor work performance on Gainer's part. There are no coachings nor disciplines in Gainer's employment file to support Defendant's claim.

18. A causal connection existed between the protected activity on April 4th and April 28th, 2016, and the materially adverse action which occurred on May 3, 2016.

19. A causal connection existed between the protected activity on April 4th and April 28th, 2016, and the materially adverse action which occurred on September 7, 2016.

20. Gainer has never received any disciplinary performance write ups or poor performance reviews during her tenure at Rockwell Automation.

21. For the foregoing reasons Gainer has been discriminated against based on retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

## COUNT 3-42 U.S.C. § 1981

22. Gainer hereby asserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

23. Gainer belongs to an identifiable class of persons who are subject to discrimination based on their race.

24. The defendants intended to discriminate against her on the basis of race.

25. The defendants discriminatory conduct abridged a right enumerated in U.S.C.§ 1981 (a).

26. All of the actions and inactions articulated above violate the Civil Rights Acts of 1866 and 1870, embodied in 42 U.S.C. § 1981, which statute clearly guarantees that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

27. This statute further indicates that the phrase "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

28. This statute further and clearly spells out that these rights are protected against impairment by non-governmental discrimination and impairment under color of state law.

29. As a direct and proximate result of the above-described actions and/or inactions, Gainer hereby reasserts the foregoing above and below allegations and incorporates them by reference as if fully set forth herein. Gainer has suffered and will continue to suffer from medical/psychological care, loss of enjoyment of life, mental anguish, severe and significant depression, regular and consistent nightmares, anger, hypervigilance, abnormal appetite, and significant anxiety. Gainer also, has incurred substantial medical and health care expenses, loss of income and other expenses and losses.

30. Gainer states that as a direct and proximate result of the intentional and malicious and/or wanton and reckless actions and/or in actions of Rockwell that she has suffered severe and significant emotional distress, anxiety, and anguish, loss of enjoyment of life, mental anguish, pain and suffering and will continue to suffer from emotional distress and into the indefinite future.  Gainer has suffered and will continue to suffer from medical/psychological care, loss of enjoyment of life, mental anguish, severe and significant depression, regular and consistent nightmares, anger, hypervigilance, abnormal appetite, and significant anxiety. Gainer also, has incurred substantial medical and health care expenses, loss of income and other related expenses and losses.

31. As a direct and proximate result of the above and below described actions and/or inactions, Gainer has incurred psychological counseling expenses and treatment and will continue to incur such treatment and expenses into the indefinite future.

32. These actions and/or inactions by Rockwell were based on Gainer's race and/or in retaliation for having participated in protective activity, all of which is in clear violation of 42 U.S.C. § 1981.

33. The actions and inactions complained of above entitle Gainer to damages for lost wages and/or back pay, front pay, emotional distress, the costs of this litigation and attorney fees, pursuant to 42 U.S.C. § 1981as well as under 42 U.S.C. § 1988.

34. The actions and inactions complained of above and below were so egregious, intentional, willful and despicable, and were perpetrated against Gainer with such disregard for her federally protected rights, as well those protected by Ohio law, and Rockwell must be required to pay an amount of punitive damages such that Rockwell will be forced to follow the law and to ensure a workplace free from discrimination.

### SUPPLEMENTAL STATE CLAIMS

### COUNT 4 - Ohio Intentional Infliction of Emotional Distress
### Ohio Revised Code § 4112.99 et seq.

35. Gainer hereby asserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

36. The actions and inactions of the defendants were so outrageous in character and to such an extreme degree that the conduct goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

37. Gainer has suffered and will continue to suffer from medical/psychological care, loss of enjoyment of life, mental anguish, severe and significant depression, regular and consistent nightmares, anger, hypervigilance, abnormal appetite, and significant anxiety. Gainer also,

has incurred substantial medical and health care expenses, loss of income and other expenses and losses.

### COUNT 5 - Ohio Race Discrimination Ohio Revised Code § 4112.99 et seq.

38. Gainer hereby reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

39. Gainer was, at all times relevant a member of the protected class, African-American.

40. Gainer suffered an adverse employment action when she was terminated on September 7, 2016.

41. Gainer was qualified for the position. Gainer had achieved a bachelor's degree in criminal justice and at the time of her termination she was in the process of completing a Master's Certification in Human Resources Management from Cornell University which she has since completed. Gainer also had 8 successful years previous HR experiences with Forest City Enterprises.

42. Prior to her termination Gainer's qualifications and performance had not been called into question.

43. From Gainer's hire date of October 7, 2013 through June of 2015, Gainer reported to Cuske. During this time, Gainer had no issues brought to her attention regarding her performance or any other aspect of her job.

44. Gainer was treated differently than similarly situated, non-protected employees. At all times relevant, Gainer was the only African American working in OES HR and under the supervision of, *inter alia*, Lawrence.

45. Gainer started being given extremely strict and harsh project specifications, far more so than her non-African American counterparts. Lawrence was continuously hyper-critical of

27

Gainer's work and would concoct reasons to make Gainer redo projects and the like multiple times.

46. It is important to note that Gainer had worked for Rockwell as a Sr. Human Resources Representative from 10/7/13 to 9/7/16 for almost 3 years. Gainer has never received any disciplinary performance write ups or poor performance reviews.

47. Gainer was not given a 2016 mid-year review to discuss performance, as required by Rockwell for all employees.

48. For the foregoing reasons Gainer has been discriminated against based on her race in violation of Ohio Revised Code § 4112.99 *et seq.*

## COUNT 6 – <u>Ohio Retaliation Ohio Revised Code § 4112.99 et seq.</u>

49. Gainer hereby asserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

50. Gainer engaged in a protected activity.  On April 4, 2016, Gainer reported Lawrence's behavior to Chris Daniels, VP of HR.  Nothing came of this report to Daniels, and Lawrence's discriminatory treatment of Gainer continued.

51. On April 28, 2016 Gainer filed an internal complaint of race discrimination against Lawrence. This complaint was submitted, via Rockwell's policy, verbally, to Kathleen Donius, Rockwell's Associate General Counsel.

52. The exercise of Gainer's protected activity was or should have been known by defendants.

53. Following Gainer's protected activity, the defendants took action which was materially adverse to Gainer.  On May 3, 2016, Defendants offered Gainer a separation agreement in lieu of investigating her claims of discrimination.  This constitutes retaliatory conduct because the transparent offer of separation in lieu of investigation was evidence of the

28

defendants' discriminatory animus resulting from Gainer's complaint of discrimination. Gainer, after consideration, rejected the separation agreement.

54. On September 7, 2016, Defendants terminated Gainer's employment, citing poor work performance.  This was the first mention whatsoever of poor work performance on Gainer's part.  There are no coachings nor disciplines in Gainer's employment file to support Defendant's claim.

55. A causal connection existed between the protected activity on April 4th and April 28th, 2016, and the materially adverse action which occurred on May 3, 2016.

56. A causal connection existed between the protected activity on April 4th and April 28th, 2016, and the materially adverse action which occurred on September 7, 2016.

57. Gainer has never received any disciplinary performance write ups or poor performance reviews during her tenure at Rockwell Automation.

58. For the foregoing reasons Gainer has been discriminated against based on retaliation in violation of based on her race in violation of Ohio Revised Code § 4112.99 *et seq.*

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court:

a. Declare the policies and practices of Rockwell Automation, as described herein to be unlawful and in violation of federal law;

b. Grant Plaintiff a permanent injunction, prohibiting Rockwell Automation from engaging in any policy or practice which discriminates on the basis of race, African American and/or retaliation;

29

c.  Order Rockwell Automation to make Giselle Gainer whole, with appropriate backpay, front pay and benefits including but not limited to 401K benefits, in amounts to be determined at trial;

d.  Award compensatory damage, punitive damages and damages for emotional distress

e.  Award Gainer all damages for all related medical/psychological care, loss of enjoyment of life, mental anguish, severe and significant depression, regular and consistent nightmares, anger, hypervigilance, abnormal appetite, significant medical/psychological care, loss of enjoyment of life, mental anguish, severe and significant depression, regular and consistent nightmares, anger, hypervigilance, abnormal appetite, significant anxiety substantial  medical and health care expenses, loss of income and other expenses and losses;

f.  Order Rockwell Automation to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from Rockwell Automation's unlawful employment practices;

g.  Order Rockwell Automation to make Plaintiff whole by providing employment, seniority, and affirmative relief necessary to eradicate the effects of Rockwell Automation's unlawful employment practices;

h.  Award Plaintiff pre-judgment and post-judgment interest on all sums awarded;

i.  Award Plaintiff the costs of this action, including costs and reasonable attorney fees;

j.  Award Plaintiff punitive damages and

k.  Grant such other legal and equitable relief as is necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by a jury of her peers on all triable issues herein.

Respectfully Submitted,

*/s/ Dennis J. Niermann*
Dennis J. Niermann, Esq. (0007988)
Dennis J. Niermann Co., LPA
P.O. Box 202295
Shaker Heights, Ohio 44120
T: (216) 375-2696
E:  dennis@niermannlaw.com

*/s/ Robert E. Davis*
Robert E. Davis, Esq. (0029697)
55 Public Sq., Ste. 2100
Cleveland, OH 44113
T: (216) 781-1285
F: (216) 696-0679
E:  attyrobertedavis@aol.com